UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ALLY BANK,
a Utah state chartered bank,
6985 Union Park Center, Suite 435,
Midvale, Utah 84047,

ALLY FINANCIAL INC.,
a Delaware corporation,
500 Woodward Avenue,
Detroit, Michigan 48226,

        Plaintiffs,

    vs.                             Case No.

RUSS DARROW, LLC,
dba Russ Darrow West Bend,
a Wisconsin limited liability company,
3210 West Washington Street,
West Bend, Wisconsin 53095,

RUSSELL M. DARROW, JR.,
an individual,
4664 Cedar Park Drive, Apt. A
West Bend Wisconsin 53095,

        Defendants.

---

## COMPLAINT

---

Plaintiffs, ALLY BANK ("Ally Bank") and ALLY FINANCIAL INC. ("Ally Financial"), (collectively "Plaintiffs" or the "Ally Parties,") allege as follows:

### JURISDICTION AND VENUE

1.     The jurisdiction of the Court over the subject matter of this action is predicated on diversity jurisdiction as defined by 28 U.S.C. § 1332.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.00 and the claims are between citizens of different states.

2.     Plaintiff Ally Bank, f/k/a GMAC Bank, f/k/a GMAC Automotive Bank is a Utah state chartered bank, with its principal place of business located at 6985 Union Park Center,

Suite 435, Midvale, Salt Lake County, Utah 84047. Ally Bank is also known as Ally Capital in Wisconsin. Ally Bank and Ally Capital Corp. are hereinafter collectively referred to as "Ally Bank." Currently, Ally Bank has no branch offices in Wisconsin.

3.      Plaintiff Ally Financial is a Delaware corporation, and is f/k/a GMAC INC., f/k/a GMAC LLC, f/k/a General Motors Acceptance Corporation ("GMAC"). GMAC INC., GMAC LLC and GMAC are collectively referred to herein as "GMAC." Ally Financial's principal place of business is located at 500 Woodward Avenue, Detroit, Wayne County, Michigan. Currently, Ally Financial has no branch offices in Wisconsin.

4.      Defendant Russ Darrow, LLC dba Russ Darrow West Bend ("Darrow West Bend" or "Dealership") is a Wisconsin limited liability company, with its principal place of business located at 3210 West Washington Street, West Bend, Washington County, Wisconsin 53095, (the "Dealership Premises"). The Ally Parties are informed and believe and thereon allege that no member of Darrow West Bend is a resident of Utah, Michigan, or Delaware for purposes of diversity jurisdiction.

5.      Defendant Russell M. Darrow, Jr. ("Darrow") is an individual residing at 4664 Cedar Park Drive, Apt. A, West Bend, Washington County, Wisconsin 53095. Darrow is a member of Darrow West Bend. Darrow West Bend and Darrow are collectively referred to hereinafter as "Defendants."

6.      Venue is proper under 28 U.S.C. § 1391 as the agreements alleged herein were entered into by Defendants with the Ally Parties and a substantial part of the events or omissions giving rise to the claims occurred in Washington County, Wisconsin which is within the Milwaukee Division of this judicial district of Wisconsin.

## THE PARTIES

7.     Ally Bank is a bank which, among other banking functions, from time to time provides retail accommodations to retail motor vehicle dealerships by accepting assignment of some of the motor vehicle retail installment sales contracts or leases ("RISCs") entered into by the dealerships with their customers in exchange for value.

8.     Ally Bank has the right to enforce all agreements that GMAC Bank entered into with third parties, including the agreements entered into by and between GMAC Bank and Defendants described herein, and to collect all sums due to GMAC Bank thereunder.

9.     Ally Financial, from time to time, among other things also provides retail accommodations to retail motor vehicle dealerships by accepting assignment of some of the motor vehicle RISCs entered into by the dealerships with their customers in exchange for value.

10.     Ally Financial has the right to enforce all agreements that GMAC entered into with third parties, including the agreements entered into by and between GMAC and Defendants described herein, and to collect all sums due to GMAC thereunder.

11.     Darrow West Bend is a retail automobile dealership in the business of selling and leasing new Chrysler, Dodge and Ram motor vehicles and used vehicles to the public through its dealership.

12.     Darrow is a member and owner of the Dealership, and is the Dealer Principal. Darrow entered into written guaranties of the obligations of Darrow West Bend to the Ally Parties.

## GENERAL ALLEGATIONS

13.     This Complaint arises from a series of "straw purchaser" transactions by Darrow West Bend.  The Ally Parties are informed and believe and thereon allege that Darrow West Bend facilitated and participated in sales of six luxury cars to six separate "straw purchasers" so

3

that the cars could be shipped and exported to China by the real party in interest. Darrow West

Bend then sold the Retail Installment Sales Contracts ("RISCs") for these six cars to the Ally

Parties which have been left to bear the loss because they cannot collect the payments owed by

the straw purchasers and they cannot repossess the cars because they cannot be located and based

on information and belief were most likely exported to China. The Ally Parties now seek to

collect from Darrow West Bend for breach of the written agreements between the parties, from

Mr. Darrow for breach of his personal guaranty, and from Darrow West Bend for its fraudulent

activity in facilitating the "straw purchaser" sales which caused the losses to the Ally Parties.

A.      **The Master Retail-Lease Agreements**

14.     Darrow West Bend entered into an agreement with Ally Bank f/k/a GMAC Bank

titled GMAC Bank Master Retail-Lease Agreement, which includes as Exhibit 1 thereto the

GMAC Bank Retail Plan dated May 1, 2009, (the "Ally Bank Retail Agreement"). A copy of the

Ally Bank Retail Agreement is attached as Exhibit A and is incorporated by this reference.

15.     Darrow West Bend entered into an agreement with Ally Financial f/k/a GMAC,

LLC titled GMAC Master Retail-Lease Agreement, which includes as Exhibit 1 thereto the

GMAC Retail Plan dated May 1, 2009, (the "Ally Retail Agreement"). A copy of the Ally Retail

Agreement is attached as Exhibit B and is incorporated by this reference. The Ally Bank Retail

Agreement and the Ally Retail Agreement (Exhibits A & B) are collectively referred to herein as

the "Retail Agreements".

16.     Under the Retail Agreements, the Ally Parties provided retail accommodations to

Darrow West Bend by accepting assignment of some of the motor vehicle RISCs that Darrow

West Bend entered into with the Dealerships customers in exchange for value.

17.     Because Darrow West Bend is in the business of selling and leasing to the public

new Chrysler, Dodge and Ram motor vehicles, the Ally Parties are informed and believe and

4

thereon allege that the vast majority of the used vehicles that Darrow West Bend sells or leases to the public are also Chrysler, Dodge, Ram or similar motor vehicles and are not used luxury or foreign automobiles such as Mercedes or Land Rover vehicles.

18.     In connection with the RISCs which the Ally Parties purchased and accepted assignment of from Darrow West Bend under the Retail Agreements, (the "Assignments"), Darrow West Bend agreed to be bound by the obligations set forth in Section IV of the Retail Plans. (Exhibits A & B, Retail Agreements, Exhibit 1 thereto, entitled Retail Plans, Section IV, unnumbered page 1. )

19.     Under Exhibit 1 to the Retail Agreements, the Retail Plans at Section IV, Darrow West Bend gave the following warranties, made the following representations and agreed to indemnify the Ally Parties:

> ### IV.     Dealer Warranties, Representations and Indemnification
>
> With respect to any Contracts, Dealer warrants and represents: **(1) The Contract arose from the sale of the property described on the face of the Contract; (2) Dealer had title to the property at the time of the sale free of any liens, except liens in favor of General Motors Corporation or GMAC; (3) All disclosures required by the law were properly made to the Buyer prior to the Buyer signing the Contract;** (4) All insurance documentation will be delivered to the Buyer within the time required by law; **(5) To the best of the Dealer's knowledge, the Customer's Statement submitted is accurate**; (6) The downpayment received by Dealer is exactly as stated; **(7) The Contract is enforceable**; and (8) Dealer is licensed as required by law.
>
> Each of these warranties and representations is material to GMAC's acceptance of the Contract.  If any of them is breached or is erroneous, Dealer unconditionally promises to accept assignment of the Contract and to pay GMAC, upon demand, the full amount of the unpaid balance under the Contract.  Dealer also agrees to indemnify GMAC to the full extent of all losses or expenses incurred by GMAC as a result of such breach or error.
>
> * * * * * *
>
> If Dealer breaches this Agreement, Dealer shall pay GMAC all losses and expenses incurred by GMAC as a result of such breach.  In addition, Dealer shall indemnify GMAC for any losses incurred by GMAC

5

> because of any judicial set-off or recovery suffered because of any claim
> or defense asserted against GMAC as a result of any act or omission on
> the part of Dealer.

(Exhibits A & B, Retail Agreements, Exhibit 1 thereto, Retail Plans, Section IV. unnumbered

pages 1-2 (emphasis added).)

### B.     The Personal Guaranties

20.     On or about May 1, 2009, and in order to induce the Ally Parties to enter into the

Retail Agreements with Darrow West Bend, Darrow made, executed and delivered to the Ally

Parties written personal continuing guaranties titled, "Guaranty Acknowledgment Agreement for

Retail Chargebacks" (collectively, the "Guaranties").  Under the Guaranties, Darrow guaranteed

full payment and performance of all obligations of Darrow West Bend to the Ally Parties under

the Retail Agreements, including but not limited to all existing and future indebtedness of

Darrow West Bend to the Ally Parties together with all costs of collecting such indebtedness

including reasonable attorneys' fees incurred by the Ally Parties.  True and correct copies of the

Guaranties are attached as Exhibits C and D, and are incorporated by this reference.

21.     Under the Guaranties, Darrow, among other things, waived any right to require

the Ally Parties to proceed against any other person or to require that the Ally Parties proceed

against or exhaust any security.

### C.     The Six RISCs

22.     The six RISCs described below and attached hereto as Exhibits F, K, Q, Y, DD,

and II were assigned to the Ally Parties by Darrow West Bend and are the subject of the Ally

Parties' claims against Darrow West Bend and Darrow alleged in this action.

23.     Each of the six RISCs described below contains on the back the following

promises made by and agreements of the person who allegedly entered into and executed the

RISC with Darrow West Bend.

6

Under Section IV of the Retail Agreements, Darrow West Bend represented and warranted to the Ally Parties that such promises and agreements of its purported customers made by their signature on the RISCs assigned to the Ally Parties were accurate, to the best of Darrow West Bend's knowledge:

> **2.    YOUR OTHER PROMISES TO US**
>
> **b.    Using the vehicle.**  You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission.  You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer…
>
> **d.    Insurance you must have on the vehicle.**  You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract.  The insurance must cover our interest in the vehicle…

(Exhibits F, K, Q, Y, DD, II, p. 2 (back of RISC).)

24.    The six RISCs further provide:

> **3.    IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES…**
>
> **d.    You may have to pay collection costs.**  If this is not a consumer contract and we hire an attorney to collect what you owe, you will pay the attorney's fee, court costs and expenses we incur as the law allows.

(Exhibits F, K, Q, Y, DD, II, p. 2 (back of RISC).)

**1.    The Bergquist RISC**

25.    Darrow West Bend entered into a purchase order ("Purchase Order") and a retail installment sales contract ("RISC") both dated October 11, 2016 with one of its purported customers, Kristen Bergquist ("Bergquist ") for the alleged sale to Bergquist of a used 2016 Land Rover, Range Rover MP with last six digits of VIN #254658, (the "Bergquist Range Rover"), referred to as Contract #69299 (the "Bergquist Purchase Order" and the "Bergquist RISC",

7

respectively). True and correct copies of the Bergquist Purchase Order and the Bergquist RISC, with private information redacted, are attached hereto as Exhibits E and F.

26. The Bergquist Purchase Order and the Bergquist RISC provide that Bergquist is a resident of Hampshire, IL.

27. The Bergquist Purchase Order and the Bergquist RISC identify Darrow West Bend's General Manager, Craig Sorbo and "House" as the salespeople for the sale of the Bergquist Range Rover.

28. The Bergquist Purchase Order (Exhibit E) states a dealer retail price of $77,000.00 for the Bergquist Range Rover. After adding services fees in the amount of $299.00, the Bergquist Purchase Order states the cash price for the Bergquist Range Rover as $77,299.00. After subtracting a trade in allowance in the amount of $2,799.00 for a used 2017 Mercedes SBE GKS 450 with last six digits of VIN#798231, and adding $16.79 in state sales tax and $99.00 in non-taxable fees, the Bergquist Purchase Order estimates a balance due to Mercedes Benz Financial of $74,500.00 with a balance of $77,414.79 to be financed by the Ally Parties under the Bergquist RISC.

29. The Bergquist RISC (Exhibit F) provides for repayment of the amount financed ($77,414.79) together with a finance charge of $21,161.13 calculated based upon an annual interest rate of 8.19% on the amount financed in 72 equal monthly payments of $1,369.11 each to be made beginning November 25, 2016.

30. The Bergquist RISC contains on the back, the promises and agreements quoted above in Paragraph Nos. 23 and 24.

31. Darrow West Bend purportedly entered into the RISC with Bergquist and thereafter assigned the Bergquist RISC to Ally Bank for value. Ally Bank paid the balance due

from Bergquist under the RISC to Darrow West Bend ($77,414.79) in exchange for assignment of the Bergquist RISC from Darrow West Bend.

32.     In connection with the Bergquist RISC, Bergquist purportedly completed a credit application in order to obtain the $77,414.79 in financing from the Ally Parties to pay the balance due for the Bergquist Range Rover, (the "Bergquist Credit Application").  A true and correct copy of the Bergquist Credit Application, with private information redacted is attached hereto as Exhibit G.

33.     Pursuant to the Bergquist Credit Application, Bergquist certified that her application was being made for individual credit in her name based upon her own income or assets and not the income or assets of another person as the basis of repayment of the credit requested.

34.     In connection with the Bergquist RISC, Bergquist purportedly entered into an agreement dated October 11, 2016 titled, "Agreement to Provide Accidental Physical Damage Insurance", (the "Bergquist Insurance Agreement"), pursuant to which Bergquist agreed to insure the Bergquist Range Rover under her State Farm Insurance Policy No. ending in 3A13 which was then in effect (the "Bergquist Insurance Policy") and request that the Bergquist Insurance Policy contain a loss payable endorsement in favor of Ally Bank.  A true and correct copy of the Bergquist Insurance Agreement, with private information redacted, is attached hereto as Exhibit H.

35.     On October 11, 2016, Darrow West Bend countersigned the Bergquist Insurance Agreement in the box at the bottom of the page title, "Dealer Confirmation" and by its countersignature indicated Darrow West Bend's receipt of confirmation from the insurance agency of the addition to the Bergquist Insurance Policy of: a) the Bergquist Range Rover; and b) a loss payable endorsement pertaining to the Range Rover and in favor of Ally Bank.

9

36.     Ally is informed and believes and thereon alleges that neither the Bergquist Range Rover or a loss payable endorsement in favor of Ally Bank were ever added to the Bergquist Insurance Policy.

37.     The Ally Parties received seven monthly payments totaling $9,583.77 under the Bergquist RISC.  The seven monthly payments in the amount of $1,369.11 each were made to the Ally Parties as follows:

   a.     Six payments made via Bill Payment Service from an unknown source account;

   b.     One payment made by check number 5268 dated April 14, 2017 from the SHHA LLC payroll Bank of America checking account ending in 2869 which include on the check an address for SHHA LLC of Unit 707, 9725 Woods Dr., Skokie, IL 55007-4451 (the "SHHA LLC Payroll Account").

38.     The Ally Parties received no payments under the Bergquist RISC since April 14, 2017.  As of January 31, 2018, $70,914.53 remains due and owing to the Ally Parties under the Bergquist RISC exclusive of interest, late charges, and attorneys' fees which continue to accrue.

39.     After diligent investigation and search, the Bergquist Range Rover has not been located by the Ally Parties.

40.     According to the Lexis Nexis Motor Vehicle and CarFax reports for the Bergquist Range Rover, Reliable Car Source Inc. was the registered owner of the Bergquist Range Rover beginning December 2, 2015 until it was registered to Bergquist effective October 21, 2016.  A true and correct copy of the Bergquist CarFax report with private information redacted is attached hereto as Exhibit I.

41.     A corporation search of the Illinois Secretary of State website for Reliable Car Source Inc. ("Reliable Car Source") identifies Reliable Car Source as an Illinois Corporation

with its agent, Abdullah Zabadneh located at 224 Stone Rd., Villa Park, IL 60181. Abdullah Zabadneh is also identified as the President of Reliable Car Source and Tserenchunt Bayarjargal is identified as its Secretary.

42.     The Ally Parties are informed and believe and thereon allege that Reliable Car Source is an unlicensed buyer and seller of used luxury motor vehicles, including but not limited to used Mercedes and Land Rover vehicles.

43.     The Ally Parties are informed and believe and thereon allege that Helena Amar is an employee of Reliable Car Source.

44.     A corporation search of the Illinois Secretary of State website for SHHA LLC indicates that SHHA LLC was an Illinois corporation established on December 30, 2015 and involuntarily dissolved on June 9, 2017. The Illinois Secretary of State identified Khaliun Amarjargal as the agent of SHHA LLC with an address of 732 Hanbury Dr., Des Plaines, IL 60016.

45.     The Ally Parties are informed and believe and thereon allege that Helena Amar is also known as Khaliun Amarjargal.

46.     The Ally Parties are informed and believe and thereon allege that at all relevant times, Albert "Alex" Golant ("Alex Golant") owned and operated WI Automotive T.R.U.S.T., Lease Registration and Consulting LLC, a Wisconsin limited liability company in Wisconsin ("Timeless Auto") which borrowed $4.7M from Westchester Export Capital LLC of White Plains, New York ("Westchester Capital") to buy vehicles for export and sale overseas, primarily in China.

47.     The Ally Parties are informed and believe and thereon allege that at all relevant times Tedmund Wayne Blankschein was the President of Timeless Auto.

48. The Ally Parties are informed and believe and thereon allege that Alex Golant and Timeless Auto have failed to repay some or all of the loan from Westchester Capital or deliver the cars allegedly purchased with some of the borrowed funds.

49. The Ally Parties are informed and believe and thereon allege that at all relevant times, Bergquist has worked at a tattoo parlor located in Hampshire, IL owned by "Neigan" and "Tom."

50. The Ally Parties were informed by Bergquist that "Neigan" and "Tom" have known "Alex" for at least five years, and "Alex" gave money to "Neigan" and "Tom" so that they could open the tattoo parlor.

51. According to Bergquist, she met "Alex" once and agreed to purchase the Mercedes with last six digits of VIN 798231 for Alex so that he could export it to China. The Mercedes with last six digits of VIN 798231 is identified as the trade-in vehicle on the Bergquist Purchase Order.

52. According to Bergquist, "Alex" is in the business of hiring people to purchase vehicles for him, which he in turn exports to China for resale.

53. The Ally Parties are informed and believe and thereon allege that the "Alex" referred to by Bergquist is Alex Golant.

54. According to Bergquist, someone from a Mercedes dealership came to the tattoo parlor with the Mercedes with last six of VIN 798231 and the paperwork for its sale. Bergquist then signed the paperwork for the Mercedes and someone else took possession of the vehicle.

55. The Ally Parties were informed by Bergquist that a few months later, someone from a dealership went to the tattoo parlor to purchase the Mercedes from her. She signed the paperwork, but claims she did not read all of it or keep any copies. Bergquist also claims that she had no idea that the Mercedes was given as a trade-in for the Bergquist Range Rover.

12

56.     The Ally Parties were informed by Bergquist that she filed police report number 17-03665 with officer Ryan Huber of the Hampshire Illinois Police Department in connection with her alleged purchase of the Bergquist Range Rover.

57.     The Ally Parties are informed and believe and thereon allege that Bergquist never sought to purchase the Bergquist Range Rover from Darrow West Bend or to deliver the Mercedes with last six digits of VIN 798231 Mercedes to Darrow West Bend as a trade-in for the Range Rover.

58.     The Ally Parties are informed and believe and thereon allege that the Bergquist Range Rover was never on Darrow West Bend's Dealership Premises or offered for sale by Darrow West Bend to the public through its retail automotive dealership.

59.     The Ally Parties are informed and believe and thereon allege that Darrow West Bend never received the Mercedes with last six of VIN 798231 from Bergquist as a trade-in for the Bergquist Range Rover.

60.     The Ally Parties are informed and believe and thereon allege that Darrow West Bend never delivered the Bergquist Range Rover to Bergquist.

61.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, the Bergquist RISC did not arise from the sale of the property described on the face of the contract because the sale of the Range Rover described in the Bergquist RISC was not made to Bergquist and Bergquist did not take possession of the Range Rover.

62.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend did not have possession of or title to the Bergquist Range Rover at the time of the alleged sale to Bergquist free of any liens.

13

63.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend failed to make all disclosures required by the law to Bergquist prior to Bergquist signing the Purchase Order or the RISC.

64.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 25-63, Darrow West Bend knew or should have known to the best of its knowledge that Bergquist's statement pursuant to the Section 2.b. of the RISC pursuant to which she agreed not to "sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission" was inaccurate and untrue.

65.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 25-63, Darrow West Bend knew or should have known to the best of its knowledge that Bergquist never intended to make the monthly payments due to the Ally Parties under the Bergquist RISC.

66.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 25-63, Darrow West Bend knew or should have known to the best of its knowledge that Bergquist never intended use the Bergquist Range Rover for personal, family or household use.

67.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 25-63, Darrow West Bend knew or should have known to the best of its knowledge that Bergquist's certification in the Bergquist

14

Credit Application that her application was being made for individual credit in her name based upon her own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, was inaccurate and untrue.

### 2.     The Solomie RISC

68.     Darrow West Bend entered into a Purchase Order and a RISC both dated November 7, 2016 with one of its purported customers, Simona Solomie ("Solomie") for the alleged sale to her of a used 2015 Mercedes-Benz GL450 4Matic with last six digits of VIN #574930, (the "Solomie Mercedes") referred to as Contract #69519 (the "Solomie Purchase Order" and the "Solomie RISC", respectively).  True and correct copies of the Solomie Purchase Order and the Solomie RISC, with private information redacted, are attached hereto as Exhibits J and K.

69.     The Solomie Purchase Order and the Solomie RISC provide that Solomie is a resident of Schaumberg, IL.

70.     The Solomie Purchase Order and the Solomie RISC identify Darrow West Bend's General Manager, Craig Sorbo and "House" as the salespeople for the sale of the Solomie Mercedes.

71.     The Solomie Purchase Order (Exhibit J) states a dealer retail price of $59,900.00 for the Solomie Mercedes.  After adding services fees in the amount of $299.00 and subtracting a discount of $9,900.00, the Solomie Purchase Order states the cash price for the Solomie Mercedes as $50,299.00.  After adding an additional $99.00 in non-taxable fees, the Solomie Purchase Order provides for Solomie to pay for the Mercedes by making a cash down payment of $5,000 with the remaining balance of $45,398.00 to be financed by the Ally Parties under the RISC.

72.     The Solomie RISC (Exhibit K) provides for repayment of the amount financed ($45,398.00) together with a finance charge of $10,489.12 calculated based upon an annual interest rate of 7.00% on the amount financed in 72 equal monthly payments of $776.21 each to be made beginning December 22, 2016.

73.     The Solomie RISC contains on the back, the promises and agreements quoted above in Paragraph Nos. 23 and 24.

74.     Darrow West Bend entered into the RISC with Solomie and assigned the Solomie RISC to Ally Bank for value.  Ally Bank paid the balance due from Solomie under the RISC to Darrow West Bend ($45,398.00) in exchange for assignment of the Solomie RISC from Darrow West Bend.

75.     In connection with the Solomie RISC, Solomie completed a credit application in order to obtain the $45,398.00 in financing from the Ally Parties to pay the balance due for the Solomie Mercedes, (the "Solomie Credit Application").  A true and correct copy of the Solomie Credit Application, with private information redacted is attached hereto as Exhibit L.

76.     Pursuant to the Solomie Credit Application, Solomie certified that her application was being made for individual credit in her name based upon her own income or assets and not the income or assets of another person as the basis of repayment of the credit requested in reliance on

77.     In connection with the Solomie RISC, on November 7, 2016, Solomie entered into an agreement titled, "Agreement to Provide Accidental Physical Damage Insurance", (the "Solomie Insurance Agreement"), pursuant to which Solomie agreed to insure the Solomie Mercedes under her Geico Insurance Policy No. ending in 7631 which was then in effect (the "Solomie Insurance Policy") and request that the Solomie Insurance Policy contain a loss

16

payable endorsement in favor of Ally Bank. A true and correct copy of the Solomie Insurance Agreement, with private information redacted, is attached hereto as Exhibit M.

78. On November 7, 2016, Darrow West Bend countersigned the Solomie Insurance Agreement in the box at the bottom of the page title, "Dealer Confirmation" and by its countersignature indicated Darrow West Bend's receipt of confirmation from Geico Insurance Company of the addition to the Solomie Insurance Policy of: a) the Solomie Mercedes; and b) a loss payable endorsement pertaining to the Mercedes and in favor of Ally Bank.

79. Ally is informed and believes and thereon alleges that neither the Solomie Mercedes or a loss payable endorsement in favor of Ally Bank were ever added to the Solomie Insurance Policy.

80. The $5,000 cash down payment due from Solomie under the Purchase Order and as the RISC was paid to Darrow West Bend by an American Express Card ending in 1012.

81. The Ally Parties received seven monthly payments totaling $5,433.47 under the Solomie RISC. Two payments totaling $1,776.21 were returned unpaid resulting in net payments received in the amount of $3,657.26. The seven monthly payments were made to the Ally Parties as follows:

a. Five payments were made via Bill Payment Service from an unknown source account;

b. One was made by check from the SHHA LLC Payroll Account by check number 5308 dated April 17, 2017. This check payment was subsequently returned unpaid due to insufficient funds;

c. One payment was made by an April 27, 2017 online payment from the SHHA LLC Payroll Account. This online payment was subsequently returned unpaid due to insufficient funds.

17

82. The Ally Parties received no payments under the Solomie RISC since May 11, 2017. As of January 31, 2018, $43,312.75 remains due and owing to the Ally Parties under the Solomie RISC exclusive of interest, late charges, and attorneys' fees which continue to accrue.

83. After diligent investigation and search, the Ally Parties have not located the Solomie Mercedes.

84. According to the Lexis Nexis Motor Vehicle and CarFax reports for the Solomie Mercedes, Reliable Car Source was the registered owner of the Solomie Mercedes beginning December 17, 2015 until it was registered to Solomie effective November 23, 2016. A true and correct copy of the Solomie CarFax report with private information redacted is attached hereto as Exhibit N.

85. According to the Lexis Nexis Motor Vehicle and CarFax reports for the Solomie Mercedes, Reliable Car Source, Darrow West Bend Purchased the Solomie Mercedes from Reliable Car Source on November 7, 2016, the same date that Darrow West Bend allegedly entered into the Solomie Purchase Order and RISC, and assigned the Solomie RISC to Ally Bank.

86. Solomie informed the Ally Parties that she met Helena Amar in a parking lot in order to sign the documents for the purchase of the Solomie Mercedes, but the vehicle was not delivered to her.

87. Solomie informed the Ally Parties that she did not make the $5,000 down payment due under the Solomie Purchase Order and the Solomie RISC.

88. In connection with Solomie's purported purchase of the Solomie Mercedes, Darrow West Bend's Finance Manager, Scott Falter, apparently received a copy of Solomie's Illinois Driver's License from "Alex" on November 7, 2016 by delivery to his e-mail account with the address scott.falter@yahoo.com, which then in turn appears to have been forwarded to

18

Mr. Falter's e-mail address with the address scott.falter@russdarrow.com. A true and correct copy of the piece of paper on which a copy of Solomie's Illinois Driver's License appears including the foregoing communications, with private information redacted is attached hereto as Exhibit O.

89. The Ally Parties are informed and believe and thereon allege that the "Alex" referred to on the piece of paper on which a copy of Solomie's Illinois Drivers' License was transmitted to Darrow West Bend is Alex Golant.

90. The Ally Parties are informed and believe and thereon allege that Solomie never sought to purchase the Solomie Mercedes from Darrow West Bend.

91. The Ally Parties are informed and believe and thereon allege that the Solomie Mercedes was never on Darrow West Bend's Dealership Premises or offered for sale by Darrow West Bend to the public through its retail automotive dealership.

92. The Ally Parties are informed and believe and thereon allege that Darrow West Bend never delivered the Solomie Mercedes to Solomie.

93. The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, the Solomie RISC did not arise from the sale of the property described on the face of the contract because the sale of the Mercedes described in the Solomie RISC was not made to Solomie and Solomie did not take possession of the Mercedes.

94. The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend did not have title to the Solomie Mercedes at the time of the sale to Solomie free of any liens.

19

95.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend failed to make all disclosures required by the law to Solomie prior to Solomie signing the Purchase Order or the RISC.

96.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 68-95, Darrow West Bend knew or should have known to the best of its knowledge that Solomie' statement pursuant to the Section 2.b. of the RISC pursuant to which she agreed not to "sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission" was inaccurate and untrue.

97.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 68-95, Darrow West Bend knew or should have known to the best of its knowledge that Solomie never intended to make the monthly payments due to the Ally Parties under the RISC.

98.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 68-95, Darrow West Bend knew or should have known to the best of its knowledge that Solomie did not make the cash down payment of $5,000.00 due under the RISC.

99.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 68-95, Darrow West Bend knew

20

or should have known to the best of its knowledge that Solomie never intended use the Solomie Mercedes for personal, family or household use.

100.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 68-95, Darrow West Bend knew or should have known to the best of its knowledge that Solomie's certification in the Solomie Credit Application that her application was being made for individual credit in her name based upon her own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, was inaccurate and untrue.

### 3.    The Demian RISC

101.    Darrow West Bend allegedly entered into a Purchase Order and a RISC both dated November 7, 2016 with Iuliu Demian ("Demian") for the purported sale to him of a used 2015 Land Rover, Range Rover with last six digits of VIN #206687, (the "Demian Range Rover"), referred to as Contract #69520 (the "Demian Purchase Order" and the "Demian RISC", respectively).  True and correct copies of the Demian Purchase Order and the Demian RISC, with private information redacted, are attached hereto as Exhibits P and Q.

102.    The Demian Purchase Order and the Demian RISC provide that Demian is a resident of Elk Grove Village, IL.

103.    The Demian Purchase Order and the Demian RISC identify Darrow West Bend's General Manager, Craig Sorbo and "House" as the salespeople for the sale of the Demian Range Rover.

104.    The Demian Purchase Order (Exhibit P) states a dealer retail price of $89,900.00 for the Demian Range Rover.  After adding services fees in the amount of $299.00, and subtracting a discount of $9,900.00 the Demian Purchase Order states the cash price for the

Demian Range Rover as $80,299.00. After subtracting a trade in allowance in the amount of $1,655.58 for a used 2017 Mercedes GKS 450 UV with last six digits of VIN#792012, and adding $99.00 in non-taxable fees, the Demian Purchase Order estimates a balance due to Mercedes Benz Financial of $78,643.42, with a cash down payment of $5,000.00 and a balance of $75,398.00 to be financed by Ally under the Demian RISC.

105.     The Demian RISC (Exhibit Q) provides for repayment of the amount financed ($75,398.00 ) together with a finance charge of $14,377.92 calculated based upon an annual interest rate of 5.84% on the amount financed in 72 equal monthly payments of $1,246.86 each to be made beginning December 22, 2016.

106.     The Demian RISC contains on the back, the promises and agreements quoted above in Paragraph Nos. 23 and 24.

107.     Darrow West Bend purportedly entered into the RISC with Demian and thereafter assigned the Demian RISC to Ally Bank for value. Ally Bank paid the balance due from Demian under the RISC to Darrow West Bend ($73,598.00) in exchange for assignment of the Demian RISC from Darrow West Bend.

108.     In connection with the Demian RISC, Demian purportedly completed a credit application in order to obtain the $73,598.00 in financing from the Ally Parties to pay the balance due for the Demian Range Rover, (the "Demian Credit Application"). A true and correct copy of the Demian Credit Application, with private information redacted is attached hereto as Exhibit R.

109.     Pursuant to the Demian Credit Application, Demian purportedly certified that his application was being made for individual credit in his name based upon his own income or assets and not the income or assets of another person as the basis of repayment of the credit requested.

110.     In connection with the Demian RISC, Demian purportedly entered into an agreement dated November 7, 2016 titled, "Agreement to Provide Accidental Physical Damage Insurance", (the "Demian Insurance Agreement"), pursuant to which Demian agreed to insure the Demian Range Rover under his Progressive Insurance Policy No. ending in 4683 which was then in effect (the "Demian Insurance Policy") and request that the Demian Insurance Policy contain a loss payable endorsement in favor of Ally Bank.  A true and correct copy of the Demian Insurance Agreement, with private information redacted, is attached hereto as Exhibit S.

111.     On November 7, 2016, Darrow West Bend countersigned the Demian Insurance Agreement in the box at the bottom of the page title, "Dealer Confirmation" and by its countersignature indicated Darrow West Bend's receipt of confirmation from the insurance agency of the addition to the Demian Insurance Policy of: a) the Demian Range Rover; and b) a loss payable endorsement pertaining to the Range Rover and in favor of Ally Bank.

112.     Ally is informed and believes and thereon alleges that neither the Demian Range Rover or a loss payable endorsement in favor of Ally Bank were ever added to the Demian Insurance Policy.

113.     In connection with Demian's purported purchase of the Demian Range Rover, Darrow West Bend's Finance Manager, Scott Falter, apparently received a copy of Demian's Illinois Driver's License from "Alex" on November 7, 2016 by delivery to his e-mail account with the address scott.falter@yahoo.com, which then in turn appears to have been forwarded to Mr. Falter's e-mail address with the address scott.falter@russdarrow.com.  A true and correct copy of the piece of paper on which a copy of Demian's Illinois Driver's License including the foregoing communications, with private information redacted is attached hereto as Exhibit T.

MIL-29162573-1 538480/1

114.     The Ally Parties are informed and believe and thereon allege that the "Alex" referred to on the piece of paper on which a copy of Demian's Illinois Drivers' License was transmitted to  Darrow West Bend is Alex Golant.

115.     The $5,000 cash down payment due from Demian under the Purchase Order and the RISC was paid to Darrow West Bend by an American Express Card ending in 1012.

116.     The Ally Parties received four monthly payments totaling $6,234.30 under the Demian RISC.  The seven monthly payments in the amount of $1,246.86 each were made to the Ally Parties as follows:

        a.     Three payments made via Bill Payment Service from an unknown source account;

        b.     One payment made by check number 5309 dated April 20, 2017 from the SHHA LLC Payroll Account.

117.     The Ally Parties received no payments under the Demian RISC since April 19, 2017.  As of January 31, 2018, $71,088.69 remains due and owing to the Ally Parties under the Demian RISC exclusive of interest, late charges, and attorneys' fees which continue to accrue.

118.     After diligent investigation and search, the Demian Range Rover has not been located by the Ally Parties.

119.     According to the Lexis Nexis Motor Vehicle and CarFax reports for the Demian Range Rover, Reliable Car Source Inc. was the registered owner of the Demian Range Rover beginning October 7, 2016 until it was registered to Demian effective November 23, 2016.  A true and correct copy of the Demian CarFax report with private information redacted is attached hereto as Exhibit U.

24

120.    According to documentation provided by Darrow West Bend to the Ally Parties, referred to as the "Deal Jacket", Darrow West Bend Purchased the Demian Range Rover from Reliable Car Source on an unspecified date.

121.    On November 14, 2016, Darrow West Bend paid Reliable Car Source $79,000.00 for the Demian Range Rover.

122.    The Ally Parties are informed by Demian that he is a victim of identity theft and that he did not purchase or finance the Demian Range Rover.

123.    The Ally Parties are informed by Demian that he has never been to Darrow West Bend or to Wisconsin.

124.    Demian has informed the Ally Parties that he gave the used 2017 Mercedes to a dealer to pay off, and that he did not use the vehicle as a trade-in on any vehicle.

125.    The Ally Parties are informed and believe and thereon allege that Demian delivered the used 2017 Mercedes GKS 450 UV with last six digits of VIN#792012 to Helena Amar sometime in September or October 2016 for payoff of the loan obtained from Mercedes-Benz Financial to finance the vehicle.

126.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend paid off the loan obtained from Mercedes-Benz Financial to finance the used 2017 Mercedes GKS 450 UV with last six of VIN 792012 on November 17, 2016.

127.    On or around July 5, 2017, Demian executed Ally's form of Affidavit of Fraud in which Demian attested that he never intended to enter into the Demian RISC, that he did not sign any documents relating to or evidencing such RISC or authorize anyone to execute it on his behalf or consent to or ratify having his signature placed on the RISC, that he did not execute the Demian Credit Application or authorize anyone to execute it for him or use his Social Security number or driver's license in connection therewith, and that he was not aware that an account

25

bearing his name and Social Security Number had been opened with Ally Financial until June 9, 2017. A true and correct copy of Demian's Affidavit of Fraud, with private information redacted is attached hereto as Exhibit V.

128.     On or around July 5, 2017, Demian met with an officer of the Elk Grove Illinois Police Department who prepared a report of Demian's claim that he is a victim of identity theft. A true and correct copy of the Demian Police Report is attached hereto as Exhibit W.

129.     The Ally Parties are informed and believe and thereon allege that Demian never sought to purchase the Demian Range Rover from Darrow West Bend and that he never delivered the Mercedes with last six of VIN 792012 Mercedes to Darrow West Bend as a trade-in for the Range Rover.

130.     The Ally Parties are informed and believe and thereon allege that the Demian Range Rover was never on Darrow West Bend's Dealership Premises or offered for sale by Darrow West Bend to the public through its retail automotive dealership.

131.     The Ally Parties are informed and believe and thereon allege that Darrow West Bend never received the Mercedes with last six of VIN 792012 from Demian as a trade-in for the Demian Range Rover.

132.     The Ally Parties are informed and believe and thereon allege that Darrow West Bend never delivered the Demian Range Rover to Demian.

133.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Agreements, Darrow West Bend knew or should have known that the Demian RISC was not enforceable against Demian.

134.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the

26

Retail Plans, the Demian RISC did not arise from the sale of the property described on the face of the contract because the sale of the Range Rover described in the Demian RISC was not made to Demian and Demian did not take possession of the Range Rover.

135.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend did not have possession of or title to the Demian Range Rover at the time of the alleged sale to Demian free of any liens.

136.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend failed to make all disclosures required by the law to Demian prior to Demian allegedly signing the Purchase Order or the RISC.

137.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 101-136, Darrow West Bend knew or should have known to the best of its knowledge that Demian's statement pursuant to the Section 2.b. of the RISC pursuant to which he agreed not to "sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission" was inaccurate and untrue.

138.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 101-136, Darrow West Bend knew or should have known to the best of its knowledge that Demian never intended to make the monthly payments due to the Ally Parties under the Demian RISC.

139.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the

Retail Plans, based on the facts alleged above in Paragraph Nos. 101-136, Darrow West Bend knew or should have known to the best of its knowledge that Demian never intended use the Demian Range Rover for personal, family or household use.

140.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 101-136, Darrow West Bend knew or should have known to the best of its knowledge that Demian's certification in the Demian Credit Application that his application was being made for individual credit in his name based upon his own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, was inaccurate and untrue.

### 4.    The Schwartz RISC

141.    Darrow West Bend entered into a Purchase Order and a RISC both dated November 11, 2016 with one of its purported customers, Lisa Schwartz ("Schwartz") pertaining to the sale of a used 2016 Mercedes-Benz TR-GKS450 with last six digits of VIN #687431, (the "Schwartz Mercedes") referred to as Contract #69550 (the "Schwartz Purchase Order" and the "Schwartz RISC", respectively).  True and correct copies of the Schwartz Purchase Order and the Schwartz RISC, with private information redacted, are attached hereto as Exhibits X and Y.

142.    The Schwartz Purchase Order and the Schwartz RISC provide that Schwartz is a resident of Milwaukee, WI.

143.    The Schwartz Purchase Order and the Schwartz RISC identify Craig Sorbo and "House" as the salespeople for the sale of the Schwartz Mercedes.

144.    The Schwartz Purchase Order (Exhibit X) states a dealer retail price of $65,900.00 for the Schwartz Mercedes.  After adding services fees in the amount of $299.00 and subtracting a discount of $10,900.00, the Schwartz Purchase Order states the cash price for the

28

Schwartz Mercedes as $55,299.00.  After adding state and local taxes in the total amount of $3,096.74 to the cash price of $55,299.00 together with an additional $194 in non-taxable fees, the Schwartz Purchase Order provides for Schwartz to pay a total of $58,589.74 for the Mercedes by making a cash down payment of $5,000 with the remaining balance of $53,589.74 to be financed by the Ally Parties under the RISC.

145.    The Schwartz RISC (Exhibit Y) provides for repayment of the amount financed ($53,589.74) together with a finance charge of $15,614.50 calculated based upon an annual interest rate of 8.69% on the amount financed in 72 equal monthly payments of $961.17 each to be made beginning December 26, 2016.

146.    The Schwartz RISC contains on the back, the promises and agreements quoted above in Paragraph Nos. 23 and 24.

147.    Darrow West Bend entered into the RISC with Schwartz and assigned the Schwartz RISC to Ally Bank for value.  Ally Bank paid the balance due from Schwartz under the RISC to Darrow West Bend ($53,589.74) in exchange for assignment of the Schwartz RISC from Darrow West Bend.

148.    In connection with the Schwartz RISC, Schwartz completed a credit application in order to obtain the $53,589.74 in financing from the Ally Parties to pay the balance due for the Schwartz Mercedes, (the "Schwartz Credit Application".)  A true and correct copy of the Schwartz Credit Application, with private information redacted is attached hereto as Exhibit Z.

149.    Pursuant to the Schwartz Credit Application, Schwartz purportedly certified that her application was being made for individual credit in her name based upon her own income or assets and not the income or assets of another person as the basis of repayment of the credit requested.

150.    In connection with the Schwartz RISC, on November 11, 2016, Schwartz purportedly entered into an agreement titled, "Agreement to Provide Accidental Physical Damage Insurance", (the "Schwartz Insurance Agreement"), pursuant to which Schwartz agreed to insure the Schwartz Mercedes under her Progressive Insurance Policy No. ending in 9261 which was then in effect (the "Schwartz Insurance Policy") and request that the Schwartz Insurance Policy contain a loss payable endorsement in favor of Ally Bank.  A true and correct copy of the Schwartz Insurance Agreement, with private information redacted, is attached hereto as Exhibit AA.

151.    On November 11, 2016, Darrow West Bend countersigned the Schwartz Insurance Agreement in the box at the bottom of the page title, "Dealer Confirmation" and by its countersignature indicated Darrow West Bend's receipt of confirmation from Progressive Insurance Company of the addition to the Schwartz Insurance Policy of: a) the Schwartz Mercedes; and b) a loss payable endorsement pertaining to the Mercedes and in favor of Ally Bank.

152.    Ally is informed and believes and thereon alleges that neither the Schwartz Mercedes or a loss payable endorsement in favor of Ally Bank were ever added to the Schwartz Insurance Policy.

153.    The $5,000 cash down payment due from Schwartz under the Purchase Order and the RISC was paid to Darrow West Bend by an American Express Card ending in 1012.

154.    The Ally Parties have received 10 monthly payments totaling $9,364.36 under the Schwartz RISC. One payment in the amount of $936.04 was returned unpaid resulting in net payments received totaling $8,428.32.  The 10 monthly payments were made to the Ally Parties as follows:

a. Four payments were made via Bill Payment Service from an unknown source account;

b. One payment was made via Debit Card from an unknown source account;

c. One payment was made by telephone by an individual named Kevin Blankschein;

d. Two payments were made to the Ally Parties' lockbox from an unknown source account;

e. Two payments were made by check from the SHHA LLC Payroll Account. One by check number 5286 dated April 11, 2017 and one by check number 5329 dated April 28, 2017. Check Number 5329 was returned unpaid on May 9, 2017 due to insufficient funds.

155. The Ally Parties are informed and believe and thereon allege that Kevin Blankschein is the son of Tedmund Wayne Blankschein, who is the President of Alex Golant's company, Timeless Auto.

156. The Ally Parties have received no payments under the Schwartz RISC since September 12, 2017. As of January 31, 2018, $48,459.48 remains due and owing to the Ally Parties under the Schwartz RISC exclusive of interest, late charges, and attorneys' fees which continue to accrue.

157. After diligent investigation and search, the Ally Parties have not located the Schwartz Mercedes.

158. According to the Lexis Nexis Motor Vehicle and CarFax reports for the Schwartz Mercedes, Reliable Car Source was the registered owner of the Schwartz Mercedes beginning December 28, 2015 until it was registered to Schwartz effective November 23, 2016. A true and

correct copy of the Schwartz CarFax report with private information redacted is attached hereto as Exhibit BB.

159.    According to documentation provided by Darrow West Bend to the Ally Parties, referred to as the "Deal Jacket", Darrow West Bend purchased the Schwartz Mercedes from Reliable Car Source on November 11, 2016, the same date that Russ Darrow West Bend allegedly entered into the Schwartz Purchase Order and RISC, and assigned the Schwartz RISC to Ally Bank.

160.    On November 17, 2016, Darrow West Bend paid Reliable Car Source $54,000.00 for the Schwartz Mercedes after having allegedly already purchased the Schwartz Mercedes from Reliable Car Source on November 11, 2016.

161.    The Ally Parties are informed and believe and thereon allege that Schwartz never sought to purchase the Schwartz Mercedes from Darrow West Bend.

162.    The Ally Parties are informed and believe and thereon allege that the Schwartz Mercedes was never on Darrow West Bend's Dealership Premises or offered for sale by Darrow West Bend to the public through its retail automotive dealership.

163.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend never delivered the Schwartz Mercedes to Schwartz.

164.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, the Schwartz RISC did not arise from the sale of the property described on the face of the contract because the sale of the Mercedes described in the Schwartz RISC was not made to Schwartz and Schwartz did not take possession of the Mercedes.

165.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the

Retail Plans, Darrow West Bend did not have title to the Schwartz Mercedes at the time of the sale to Schwartz free of any liens.

166.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 141-165, Darrow West Bend knew or should have known to the best of its knowledge that Schwartz' statement pursuant to the Section 2.b. of the RISC pursuant to which she agreed not to "sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission" was inaccurate and untrue.

167.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 141-165, Darrow West Bend knew or should have known to the best of its knowledge that Schwartz never intended to make the monthly payments due to the Ally Parties under the RISC.

168.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 141-165, Darrow West Bend knew or should have known to the best of its knowledge that Schwartz never intended to make the cash down payment of $5,000.00 due under the RISC.

169.     The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 141-165, Darrow West Bend knew or should have known to the best of its knowledge that Schwartz never intended use the Schwartz Mercedes for personal, family or household use.

170.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 141-165, Darrow West Bend knew or should have known to the best of its knowledge that Schwartz' certification in the Schwartz Credit Application that her application was being made for individual credit in her name based upon her own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, was inaccurate and untrue.

### 5.    The Slaski RISC

171.    Darrow West Bend entered into a Purchase Order and a RISC both dated November 15, 2016 with one of its purported customers, Mariusz Slaski ("Slaski") for the alleged sale to him of a used 2015 Land Rover, Range Rover MP with last six digits of VIN 240805, (the "Slaski Range Rover"), referred to as Contract #69586 (the "Slaski Purchase Order" and the "Slaski RISC", respectively).  True and correct copies of the Slaski Purchase Order and the Slaski RISC, with private information redacted, are attached hereto as Exhibits CC and DD.

172.    The Slaski Purchase Order and the Demian RISC provide that Slaski is a resident of Wood Dale, IL.

173.    The Slaski Purchase Order and the Slaski RISC identify Darrow West Bend's General Manager, Craig Sorbo and "House" as the salespeople for the sale of the Slaski Range Rover.

174.    The Slaski Purchase Order (Exhibit CC) states a dealer retail price of $89,900.00 for the Slaski Range Rover.  After adding services fees in the amount of $299.00, and subtracting a discount of $9,900.00 the Slaski Purchase Order states the cash price for the Slaski Range Rover as $80,299.00.  After subtracting a trade in allowance in the amount of $35,299.00 for a

34

used 2016 Mercedes GKS 450 UV with last six digits of VIN 619695, and adding $99.00 in non-taxable fees, the Slaski Purchase Order estimates a balance due to Suntrust of $22,550.00 with a balance of $57,948.00 to be financed by Ally under the Slaski RISC.

175.    The Slaski RISC (Exhibit DD) provides for repayment of the amount financed ($57,948.00 ) together with a finance charge of $12,576.72 calculated based upon an annual interest rate of 6.60% on the amount financed in 72 equal monthly payments of $979.51 each to be made beginning December 30, 2016.

176.    The Slaski RISC contains on the back, the promises and agreements quoted above in Paragraph Nos. 23 and 24.

177.    Darrow West Bend entered into the RISC with Slaski and assigned the Slaski RISC to Ally Bank for value.  Ally Bank paid the balance due from Slaski under the RISC to Darrow West Bend ($57,948.00) in exchange for assignment of the Slaski RISC from Darrow West Bend.

178.    In connection with the Slaski RISC, Slaski completed a credit application in order to obtain the $57,948.00 in financing from the Ally Parties to pay the balance due for the Slaski Range Rover, (the "Slaski Credit Application").  A true and correct copy of the Slaski Credit Application, with private information redacted is attached hereto as Exhibit EE.

179.    Pursuant to the Slaski Credit Application, Slaski allegedly certified that his application was being made for individual credit in his name based upon his own income or assets and not the income or assets of another person as the basis of repayment of the credit requested.

180.    In connection with the Slaski RISC, Slaski entered into an agreement dated November 15, 2016 titled, "Agreement to Provide Accidental Physical Damage Insurance", (the "Slaski Insurance Agreement"), pursuant to which Slaski agreed to insure the Slaski Range

35

Rover under his State Farm Insurance Policy No. ending in E09-13A which was then in effect (the "Slaski Insurance Policy") and request that the Slaski Insurance Policy contain a loss payable endorsement in favor of Ally Bank. A true and correct copy of the Slaski Insurance Agreement, with private information redacted, is attached hereto as Exhibit FF.

181.    On November 15, 2016, Darrow West Bend completed but apparently failed to countersign the Slaski Insurance Agreement in the box at the bottom of the page titled, "Dealer Confirmation" indicating Darrow West Bend's receipt of confirmation from the insurance agency of the addition to the Slaski Insurance Policy of: a) the Slaski Range Rover; and b) a loss payable endorsement pertaining to the Range Rover and in favor of Ally Bank.

182.    Ally is informed and believes and thereon alleges that neither the Slaski Range Rover or a loss payable endorsement in favor of Ally Bank were ever added to the Slaski Insurance Policy.

183.    The Ally Parties have received nine monthly payments totaling $8,815.59 under the Slaski RISC. Two payments totaling $1,959.02 were returned unpaid resulting in net payment received in the amount of $6,856.57. The nine monthly payments were made to the Ally Parties as follows:

        a.      Three payments made via Bill Payment Service from an unknown source account;

        b.      Two payments from the SHHA LLC Payroll Account, one made by check number 5284 dated April 28, 2017 in the amount of $1,000.00 and one made by check no. 5331 April 28, 2017 in the amount of $959.02;

        c.      Four payments from an online JPMorgan Chase account which may be held in Slaski's name.

36

184. The Ally Parties have received no payments under the Slaski RISC since July 11, 2017. As of January 31, 2018, $53,499.65 remains due and owing to the Ally Parties under the Slaski RISC exclusive of interest, late charges, and attorneys' fees which continue to accrue.

185. After diligent investigation and search, the Slaski Range Rover has not been located by Ally.

186. According to the Lexis Nexis Motor Vehicle and CarFax reports for the Slaski Range Rover, Reliable Car Source Inc. was the registered owner of the Slaski Range Rover beginning October 27, 2016 until it was registered to Slaski effective November 23, 2016. A true and correct copy of the Slaski Range Rover CarFax report with private information redacted is attached hereto as Exhibit GG.

187. According to documentation provided by Darrow West Bend to the Ally Parties, referred to as the "Deal Jacket," Darrow West Bend purchased the Slaski Range Rover from Reliable Car Source on November 15, 2016, the same day that Darrow West Bend entered into the Purchase Order and RISC with Slaski.

188. On November 29, 2016, Darrow West Bend paid Reliable Car Source $79,000.00 for the Slaski Range Rover.

189. According to the Lexis Nexis Motor Vehicle report for the used 2016 Mercedes GKS450 UV with last six digits of VIN 619695 purportedly traded in to Darrow West Bend by Slaski was registered to Reliable Car Source on January 27, 2017.

190. The Ally Parties are informed and believe and thereon allege that Slaski never sought to purchase the Slaski Range Rover from Darrow West Bend and that he never delivered the Mercedes with last six digits of VIN 792012 Mercedes to Darrow West Bend as a trade-in for the Range Rover.

37

191.    The Ally Parties are informed and believe and thereon allege that the Slaski Range Rover was never on Darrow West Bend's Dealership Premises or offered for sale by Darrow West Bend to the public through its retail automotive dealership.

192.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend never received the Mercedes with last six digits of VIN 792012 from Slaski as a trade-in for the Slaski Range Rover.

193.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend never delivered the Slaski Range Rover to Slaski.

194.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, the Slaski RISC did not arise from the sale of the property described on the face of the contract because the sale of the Range Rover described in the Slaski RISC was not made to Slaski and Slaski did not take possession of the Range Rover.

195.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend did not have possession of or title to the Slaski Range Rover at the time of the alleged sale to Slaski free of any liens.

196.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 171-195, Darrow West Bend knew or should have known to the best of its knowledge that Slaski's statement pursuant to the Section 2.b. of the RISC pursuant to which he agreed not to "sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission" was inaccurate and untrue.

38

197.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 171-195, Darrow West Bend knew or should have known to the best of its knowledge that Slaski never intended to make the monthly payments due to the Ally Parties under the Slaski RISC.

198.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 171-195, Darrow West Bend knew or should have known to the best of its knowledge that Slaski never intended use the Slaski Range Rover for personal, family or household use.

199.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 171-195, Darrow West Bend knew or should have known to the best of its knowledge that Slaski's certification in the Slaski Credit Application that his application was being made for individual credit in his name based upon his own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, was inaccurate and untrue.

### 6.    The Sagan RISC

200.    Darrow West Bend entered into a Purchase Order and a RISC both dated November 17, 2016 with one of its purported customers, Ben Sagan ("Sagan") for the sale of a used 2015 Mercedes-Benz GL550 4Matic with last six digits of VIN 548450, (the "Sagan Mercedes")  referred to as Contract #69602 (the "Sagan Purchase Order" and the "Sagan RISC", respectively).  True and correct copies of the Sagan Purchase Order and the Sagan RISC, with private information redacted, are attached hereto as Exhibits HH and II.

201.    The Sagan Purchase Order and the Sagan RISC provide that Sagan is a resident of Bloomingdale, IL.

202.    The Sagan Purchase Order and the Schwartz RISC identify Craig Sorbo and "House" as the salespeople for the sale of the Sagan Mercedes.

203.    The Sagan Purchase Order (Exhibit HH) states a dealer retail price of $79,990.00 for the Sagan Mercedes. After adding services fees in the amount of $299.00 and subtracting a discount of $4,990.00, the Sagan Purchase Order states the cash price for the Sagan Mercedes as $75,299.00. After an additional $99.00 in non-taxable fees, the Sagan Purchase Order provides for Sagan to pay for the Mercedes by making a cash down payment of $5,000 with the remaining balance of $70,398.00 to be financed by Ally under the RISC.

204.    The Sagan RISC (Exhibit II) provides for repayment of the amount financed ($70,398.00) together with a finance charge of $17,010.72 calculated based upon an annual interest rate of 7.30% on the amount financed in 72 equal monthly payments of $1,214.01 each to be made beginning January 1, 2017.

205.    The Sagan RISC contains on the back, the promises and agreements quoted above in Paragraph Nos. 23 and 24.

206.    Darrow West Bend entered into the RISC with Sagan and assigned the Sagan RISC to Ally Bank for value. Ally Bank paid the balance due from Sagan under the RISC to Darrow West Bend ($70,398.00) in exchange for assignment of the Sagan RISC from Darrow West Bend.

207.    In connection with the Sagan RISC, Sagan completed a credit application in order to obtain the $70,398.00 in financing to pay the balance due for the Sagan Mercedes, (the "Sagan Credit Application".) A true and correct copy of the Sagan Credit Application, with private information redacted is attached hereto as Exhibit JJ.

40

208.     Pursuant to the Sagan Credit Application, Sagan certified that his application was being made for individual credit in his name based upon his own income or assets and not the income or assets of another person as the basis of repayment of the credit requested.

209.     In connection with the Sagan RISC, Sagan entered into an agreement titled, "Agreement to Provide Accidental Physical Damage Insurance", (the "Sagan Insurance Agreement"), pursuant to which Sagan agreed to insure the Sagan Mercedes under his Pure Insurance Policy No. ending in 1302 which was then in effect (the "Sagan Insurance Policy") and request that the Sagan Insurance Policy contain a loss payable endorsement in favor of Ally Bank.  A true and correct copy of the Sagan Insurance Agreement is attached hereto as Exhibit KK.

210.     On November 17, 2016, Darrow West Bend countersigned the Sagan Insurance Agreement in the box at the bottom of the page titled, "Dealer Confirmation" indicating Darrow West Bend's receipt of confirmation from the insurance company of the addition to the Sagan Insurance Policy of: a) the Sagan Mercedes; and b) a loss payable endorsement pertaining to the Sagan Mercedes and in favor of Ally Bank.

211.     Ally is informed and believes and thereon alleges that neither the Sagan Mercedes or a loss payable endorsement in favor of Ally Bank were ever added to the Sagan Insurance Policy.

212.     The $5,000 cash down payment due from Sagan under the Purchase Order and the RISC was paid to Darrow West Bend by an American Express Card ending in 1012.

213.     The Ally Parties received 4 monthly payments totaling $6,130.70 under the Sagan RISC.  One payment in the amount of $1,237.68 was returned unpaid resulting in net payments received totaling $4,893.02.  The 4 monthly payments were made to the Ally Parties as follows:

a.      Three payments were made via Bill Payment Service from an unknown source account;

b.      One payment was made from the SHHA LLC Payroll Account by check no. 5332 in the amount of $1237.68. The check payment was returned for insufficient funds.

214.    The Ally Parties have received no payments under the Sagan RISC since April 27, 2017.  As of January 31, 2018, $67,007.74 remains due and owing to the Ally Parties under the Sagan RISC exclusive of interest, late charges, and attorneys' fees which continue to accrue.

215.    After diligent investigation and search, the Ally Parties have not located the Sagan Mercedes.

216.    According to the CarFax report for the Sagan Mercedes (the "Sagan CarFax Report"), a dealer located in Villa Park, IL took title to the vehicle while in inventory beginning November 15, 2016 until it was registered to Sagan effective November 23, 2016.  A true and correct copy of the Sagan CarFax report with private information redacted is attached hereto as Exhibit LL.

217.    According to documentation provided by Darrow West Bend to the Ally Parties, referred to as the "Deal Jacket", Darrow West Bend Purchased the Sagan Mercedes from Reliable Car Source on November 17, 2016, the same date that Russ Darrow West Bend allegedly entered into the Sagan Purchase Order and RISC, and assigned the Sagan RISC to Ally Bank.

218.    On November 23, 2016, Darrow West Bend paid Reliable Car Source $74,000.00 for the Sagan Mercedes after having allegedly already purchased the vehicle from Reliable Car Source on November 17, 2016.

219.    The Ally Parties are informed and believe and thereon allege that the Sagan Mercedes was never on Darrow West Bend's Dealership Premises or offered for sale by Darrow West Bend to the public through its retail automotive dealership.

220.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend never delivered the Sagan Mercedes to Sagan.

221.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, Darrow West Bend did not have title to the Sagan Mercedes at the time of the sale to Sagan free of any liens.

222.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, the Sagan RISC did not arise from the sale of the property described on the face of the contract because the sale of the Mercedes described in the Sagan RISC was not made to Sagan and Sagan did not take possession of the Mercedes.

223.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 200-222, Darrow West Bend knew or should have known to the best of its knowledge that Sagan' statement pursuant to the Section 2.b. of the RISC pursuant to which he agreed not to "sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission" was inaccurate and untrue.

224.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 200-222, Darrow West Bend

43

knew or should have known to the best of its knowledge that Sagan never intended to make the monthly payments due to the Ally Parties under the RISC.

225.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 200-222, Darrow West Bend knew or should have known to the best of its knowledge that Sagan never intended to make the cash down payment of $5,000.00 due under the RISC.

226.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 200-222, Darrow West Bend knew or should have known to the best of its knowledge that Sagan never intended use the Sagan Mercedes for personal, family or household use.

227.    The Ally Parties are informed and believe and thereon allege that in violation of the representations and warranties given to them by Darrow West Bend under Section IV of the Retail Plans, based on the facts alleged above in Paragraph Nos. 200-222, Darrow West Bend knew or should have known to the best of its knowledge that Sagan' certification in the Sagan Credit Application that his application was being made for individual credit in his name based upon his own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, was inaccurate and untrue.

228.    Based on the foregoing, and  the defaults of Bergquist, Schwartz, Demian, Slaski, Sagan and Solomie under their respective RISCs, beginning on August 31, 2017 and continuing thereafter to the present, the Ally Parties demanded that Darrow West Bend accept reassignment of the Bergquist, Schwartz, Demian, Slaski, Sagan and Solomie RISCs (collectively, the "Six RISCs") and pay the Ally Parties the balance due thereunder as required by Section IV of the

44

Retail Plans, but Darrow West Bend refuses and continues to refuse to do so. True and correct copies of the demands for reassignment delivered to Darrow West Bend by the Ally Parties are attached hereto as Exhibit MM.

## FIRST CLAIM FOR RELIEF

### (Breach of Retail Agreements – Against Darrow West Bend)

229. The Ally Parties hereby incorporate by reference as though fully set forth herein paragraphs 1 through 228 above.

230. The Ally Parties have performed all conditions, covenants and promises required of them in accordance with the terms and conditions of the Retail Agreements.

231. Pursuant to Section IV. of the Retail Plans entered into by Darrow West Bend with the Ally Parties (Exhibit 1 to the Retail Agreements), Darrow West Bend made certain warranties and representations to the Ally Parties in connection with each of the Six RISCs and agreed that such warranties and representations were material to the Ally Parties' acceptance of the assignment of the Six RISCs from Darrow West Bend in exchange for payment by the Ally Parties to Darrow West Bend of the balance due for the vehicle identified in each RISC.

232. Pursuant to Section IV. of the Retail Plans, Darrow West Bend also unconditionally promised and agreed that if any of the representations and warranties made thereunder to the Ally Parties were breached or were erroneous, Darrow West Bend would accept assignment of the RISC and pay to the Ally Parties upon demand, the full amount of the unpaid balance due under the RISC.

233. Darrow West Bend further agreed under Section IV. of the Retail Plans to indemnify the Ally Parties to the full extent of all losses or expenses incurred by them as a result of such breach or error.

234. Darrow West Bend breached Section IV. of the Retail Plans by making erroneous, untruthful and fraudulent representations and warranties to the Ally Parties in connection with the Six RISCs, as alleged above.

235. Darrow West Bend is also in breach of Section IV. of the Retail Plans by failing and refusing to accept re-assignment of the Six RISCs from the Ally Parties, by failing and refusing to pay the Ally Parties after due demand the full amount of the unpaid balance due under each of the Six RISCs, and by refusing to indemnify the Ally Parties to the full extent of all losses or expenses incurred by them as a result of Darrow West Bend's breaches of the Retail Plans.

236. As of January 31, 2018, Darrow West Bend's total indebtedness under the Retail Plans to the Ally Parties and the amount by which the Ally Parties have been damaged as a result of Darrow West Bend's breaches is approximately $355,364.01. Interest and other expenses continue to accrue as determined by the terms and provisions of the Six RISCs.

237. The $355,364.01 due and owing to the Ally Parties is comprised of the: a) $70,914.53 due under the Bergquist RISC; b) $43,312.75 due under the Solomie RISC; c) $71,088.69 due under the Demian RISC; d) $49,540.65 due under the Schwartz RISC; e) $53,449.65 due under the Slaski RISC; and f) $67,007.74 due under the Sagan RISC.

## SECOND CLAIM FOR RELIEF

### (Breach of Guaranty - Against Russell M. Darrow, Jr.)

238. The Ally Parties hereby incorporate by reference as though fully set forth herein paragraphs 1 through 237 above.

239. Under the Guaranties (Exhibits C and D), Darrow guaranteed full payment and performance of all obligations owed to the Ally Parties by Darrow West Bend under the Retail Agreements (which include as Exhibit 1 thereto, the Retail Plans), including but not limited to all

46

existing and future indebtedness of Darrow West Bend to the Ally Parties together with all costs of collecting such indebtedness including reasonable attorneys' fees incurred by the Ally Parties.

240.    Darrow West Bend breached and is in default of the Retail Agreements as alleged above.  Darrow West Bend's indebtedness to the Ally Parties under the Retail Agreements in the amount of $355,364.01, together with interest and other expenses which continue to accrue in accordance with the terms and provisions of the Six RISCs, is now due and payable in full.

241.    Darrow West Bend's indebtedness to the Ally Parties under the Retail Agreements is an obligation of Darrow which is included within the Guaranties.

242.    By this Complaint, the Ally Parties make demand on Darrow under the Guaranties to pay the indebtedness owed by Darrow West Bend to the Ally Parties.

243.    As of January 30, 2018, by reason of his Guaranties of the indebtedness owed by Darrow West Bend to the Ally Parties under the Retail Agreements, Darrow owes the Ally Parties approximately $355,364.01, together with interest and other expenses which continue to accrue in accordance with the terms and provisions of the Six RISCs.

244.    The Guaranties provide that Darrow shall pay reasonable attorneys' fees and costs incurred by the Ally Parties in connection with collecting the indebtedness of Darrow West Bend to the Ally Parties under the Retail Agreements.  By reason of Darrow West Bend's breach of the Retail Agreements and defaults thereunder, and by reason of Darrow's breach of the Guaranties, the Ally Parties have employed the undersigned counsel to commence and prosecute this action.  Accordingly, the Ally Parties are entitled to recover from Darrow their attorneys' fees and costs incurred herein.

## <u>THIRD CLAIM FOR RELIEF</u>

### (Fraud (Intentional Misrepresentation) - Against Darrow West Bend)

245.     The Ally Parties hereby incorporate by reference as though fully set forth herein paragraphs 1 through 244 above.

246.     In connection with requesting that the Ally Parties accept assignment of the Six RISCs, Darrow West Bend made representations and warranties to the Ally Parties under Section IV. of the Retail Plans (Exhibit 1 to the Retail Agreements) as alleged above.

247.     Darrow West Bend made such representations and warranties to the Ally Parties by submitting each of the Six RISCs together with each buyer's Credit Application and Insurance Agreement to Ally's Consumer and Credit Operations Division for assignment through Ally's electronic booking system using a password protected sign-on designated for use by Darrow West Bend's General Manager, Craig Sorbo.

248.     The Ally Parties are informed and believe and thereon allege that the representations and warranties made by Darrow West Bend to the Ally Parties under Section IV. of the Retail Plans in connection with the submission of each of the Six RISCs to Ally's Consumer and Credit Operations Division for assignment were untrue as follows:

a.     Darrow West Bend did not have possession of or title to the vehicles identified in each of the Six RISCS free of any liens at the time of the sale of each vehicle to the buyer identified in each RISC;

b.     None of the Six RISCs "arose from the sale of the property described on the face of the contract" because the sale of the vehicle described in each RISC was not made to the buyer identified in the RISC and the buyer did not take possession of the vehicle;

c.     Darrow West Bend did not receive confirmation that the vehicles identified in each of the Six RISCs had been added to the insurance policies of the respective

48

buyers or that a loss payable endorsement in favor of Ally Bank had been issued by the buyers'
respective insurance companies;

        d.      The promises of each of the buyers identified in each of the Six RISCs
under Section 2.b. and 2.d. of the RISCs not to remove the vehicle from the U.S. or to sell of
transfer any interest in the vehicle, and to insure the vehicle against loss or damage were untrue;

        e.      The statements of each of the buyers identified in each of the Six RISCs
made in their respective credit applications and insurance agreements were untrue;

        f.      The Demian RISC and Bergquist RISCS are not enforceable against
Demian or Bergquist; and/or

        g.      The disclosures required by law were not made to Solomie, Demian or
Bergquist.

    249.    The Ally Parties are informed and believe and thereon allege that Darrow West
Bend knew that the foregoing representations and warranties made to the Ally Parties were
untrue and that Bergquist, Solomie, Demian, Schwartz, Slaski and Sagan were "straw
purchasers" based upon the facts and circumstances alleged above or alternatively, that Darrow
West Bend made such representations and warranties to the Ally Parties with reckless disregard
as to the truth or falsity of such representations and warranties and without sufficient basis or
information.

    250.    The Ally Parties are informed and believe and thereon allege that Darrow West
Bend made such fraudulent and untruthful representations and warranties to the Ally Parties with
the intention and in order to induce the Ally Parties to accept assignment of the Six RISCs and
because Darrow West Bend had a financial interest in inducing the Ally Parties to accept such
assignments.

251.   Upon receiving each of the Six RISCS from Darrow West Bend for assignment and in connection with Ally's Consumer Credit Operations Divisions' review, approval and acceptance of the assignment of each RISC, the Ally Parties believed that the representations and warranties of Darrow West Bend were truthful and accurate, and in reliance thereon, the Ally Parties accepted assignment of the Six RISCs and paid value to Darrow West Bend in exchange for such assignments.

252.   The Ally Parties would not have accepted assignment of any of the Six RISCs from Darrow West Bend or paid value to Darrow West Bend for the Six RISCS if the Ally Parties had known the true facts and circumstances.

253.   The Ally Parties have been damaged by their reliance on the representations and warranties of Darrow West Bend because the buyers identified in each of the Six RISCs have defaulted on their payments and $355,364.01 is due and owing to the Ally Parties under the Six RISCs (together with interest and other expenses which continue to accrue), the vehicles identified in each of the Six RISCs have disappeared and cannot be located, the Demian and the Bergquist RISCs are not enforceable, and Darrow West Bend has refused to accept reassignment of each of the Six RISCs.

## FOURTH CLAIM FOR RELIEF

### (Negligent Misrepresentation) - Against Darrow West Bend

254.   The Ally Parties hereby incorporate by reference as though fully set forth herein paragraphs 1 through 253 above.

255.   In connection with each of the Six RISCs, Darrow West Bend negligently made untruthful and inaccurate representations and warranties to the Ally Parties under Section IV of the Retail Plans as alleged above.

50

256.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend should have known that the foregoing representations and warranties made to the Ally Parties were untrue and that Bergquist, Solomie, Demian, Schwartz, Slaski and Sagan were "straw purchasers" based upon the facts and circumstances alleged above.

257.    The Ally Parties would not have accepted assignment of the Six RISCs from Darrow West Bend or paid value to Darrow West Bend for the Six RISCS if the Ally Parties had known the true facts and circumstances.

258.    The Ally Parties are informed and believe and thereon allege that Darrow West Bend made such representations and warranties to the Ally Parties negligently, without reasonable care and in order to induce the Ally Parties to accept assignment of the Six RISCs and because Darrow West Bend had a financial interest in inducing the Ally Parties to accept the assignments.

259.    The Ally Parties believed that the representations and warranties of Darrow West Bend were truthful and accurate, and in reliance thereon, the Ally Parties accepted assignment of the Six RISCs and paid value to Darrow West Bend in exchange for such assignments.

260.    The Ally Parties have been damaged by their reliance on the representations and warranties of Darrow West Bend because the buyers identified in each of the Six RISCs have defaulted on their payments and $355,364.01 is due and owing to the Ally Parties under the RISCs (together with interest and other expenses which continue to accrue), the vehicles identified in each of the Six RISCs have disappeared and cannot be located, the Demian and the Bergquist RISCs are not enforceable, and Darrow West Bend has refused to accept reassignment of each of the Six RISCs.

MIL-29162573-1 538480/1

## PRAYER

WHEREFORE, the Ally Parties pray for judgment against the Defendants as follows:

1.      Under the Retail Agreements for damages against Darrow West Bend in the sum of $355,364.01, representing the amount due and payable to the Ally Parties under the Six RISCs as of January 31, 2018, or such other amount to be proved at trial, with interest and other charges as allowed by contract;

2.      Under the Guaranties for damages against Darrow in the sum of $355,364.01 or such other amount to be proved at trial, with interest and other charges as allowed by contract, together with the reasonable attorneys' fees incurred by the Ally Parties incurred in this Action;

3.      For general, special, compensatory, and punitive damages in an amount to be proved at trial;

4.      For costs and expenses of suit herein, together with interest at a rate provided by law; and

5.      For such other and further relief as the Court may deem just and proper.

Dated this 19th day of March, 2018.

s/ Margaret K. Heitkamp
_____
Edward J. Heiser
Anthony J. Anzelmo
Marci V. Kawski
Margaret K. Heitkamp
HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
(414) 978-5445  Phone
(414) 223-5000  Fax
Edward.Heiser@huschblackwell.com
Marci.Kawski@huschblackwell.com
Anthony.Anzelmo@huschblackwell.com
Margaret.Heitkamp@huschblackwell.com

52

Duane M. Geck
(Application for Admission to Practice pending)
Donald H. Cram
(Application for Admission to Practice pending)
Eleanor M. Roman
(Application for Admission to Practice pending)
SEVERSON & WERSON P.C.
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 398-3344  Phone
(415) 956-0439  Fax

Attorneys for Plaintiffs,
ALLY BANK and ALLY FINANCIAL INC.

53